In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1826

TRIANDUS TABB,

*Petitioner-Appellant,*

*v.*

TIM CHRISTIANSON,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-02023 — **John W. Darrah**, *Judge.*

ARGUED JANUARY 18, 2017 — DECIDED APRIL 28, 2017

Before WOOD, *Chief Judge*, and POSNER and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. On September 6, 2003, at 1:20 p.m., Salvador Gomez stopped his car at a red light at a Chicago intersection. Through the driver-side window, a man approached and tried to steal his car. When Mr. Gomez would not yield, the attacker shot him three times. Mr. Gomez survived. He later identified petitioner Triandus Tabb as the

shooter. Tabb was convicted in Illinois state court of attempted first-degree murder, aggravated battery with a firearm, and attempted aggravated vehicular hijacking. At trial, the crux of the State's evidence was the victim's identification of Tabb. Over the long course of state and federal court proceedings in his case, Tabb finished his prison sentence but is still under mandatory supervised release. He now appeals the denial of his habeas corpus petition challenging his conviction.

The focus of Tabb's federal habeas claims is the reliability of Mr. Gomez's identification of Tabb as the shooter. We have warned that "it is vital that evidence about how photo spreads, showups, and lineups are conducted be provided to defense counsel and the court." *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003). That is because "recollection is suggestible." *Id.* "Once the witness decides that 'X is it' the view may be unshakable." *Id.* Recent psychological research challenges "the lay intuition that confident memories of salient experiences … are accurate." *Id.*, quoting *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 296 (7th Cir. 1990) (alteration in original). At the same time, jurors "tend to think that witnesses' memories are reliable," and "this gap between the actual error rate and the jurors' heavy reliance on eyewitness testimony sets the stage for erroneous convictions." *Id.*

Tabb has presented evidence calling into question the objectivity of the lineup procedures in which he was identified and the ensuing validity of the witness identifications of him at trial. He has argued that evidence about how the lineup was conducted was kept from the defense and then destroyed. See *Brady v. Maryland*, 373 U.S. 83 (1963) (suppression of material evidence favorable to the accused, when requested

by defense, violates due process); *Arizona v. Youngblood*, 488
U.S. 51 (1988) (holding that the prosecution's destruction of
material exculpatory evidence is a due process violation).
Tabb has not shown, however, that he is entitled to relief from
his conviction. We affirm the district court's denial of his mo-
tion for summary judgment and its subsequent dismissal of
Tabb's habeas petition. To explain, we first review the factual
and procedural history, and we then examine Tabb's claims
under *Brady* and then *Youngblood*.

I.   *Factual and Procedural History*

In federal habeas corpus proceedings, we accept as true
the factual findings of state courts unless they are rebutted by
clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Hall v.
Zenk*, 692 F.3d 793, 805 (7th Cir. 2012). We offer a review of the
fourteen-year history of Tabb's case.

A.   *Tabb's Trial and Direct Appeal*

On the day of the shooting, September 6, 2003, petitioner
Tabb, Norman Brown, and Isaac Pittard all resided at the De-
partment of Children and Family Services Daniel J. Nellum
Group Home in Chicago and were ostensibly members of the
Blackstone street gang. *People v. Tabb* (*Tabb II*), 2013 IL App
(1st) 121748-U, 2013 WL 3379128 at *2 (Ill. App. 2013). From
the time he was just four years old, Tabb had been a ward of
the Department of Children and Family Services. He had
lived in the Nellum Group Home for less than a year. The
group home log that tracked when residents came and went
on the day of the shooting recorded Brown and Pittard leav-
ing the home at 12:30 p.m. and 12:45 p.m., respectively. Sig-
nificantly, the log book notes that Tabb was not granted per-
mission to leave the home until 1:45 p.m.—after the shooting.

At trial the State challenged the reliability of the log book. See *id*. at *3. (We do not attempt to resolve that factual issue.)

That same day, at about 1:20 p.m., Salvador Gomez stopped at a red light just a few blocks away from the group home. *People v. Tabb* (*Tabb I*), 870 N.E.2d 914, 917 (Ill. App. 2007); *Tabb II*, 2013 WL 3379128, at *1. His windows were already rolled down when a man approached and pointed a gun at him. *Tabb II*, 2013 WL 3379128, at *1. The assailant demanded that Mr. Gomez get out of his car, but he refused. *Id.* Instead, he struggled with the assailant over the gun before being shot twice in the stomach and once in the arm. *Id.*; *Tabb I*, 870 N.E.2d at 918. Gomez needed major surgery but survived the attack.

Delayed by the surgery, seven weeks later on October 25, 2003, Gomez identified Tabb from a police lineup. *Tabb II*, at *2. Gomez had been under duress, afraid for his life, at the time of the attack. His initial description of the attacker was vague: a tall skinny black man wearing white clothes and a bandana. At Tabb's trial a year later, Gomez was unable to recall confidently how long the entire encounter lasted, perhaps as short as five seconds or as long as five minutes, but he identified Tabb as the shooter. Also at trial, an off-duty police officer who was at the scene of the shooting described the shooter as wearing a black and white jersey and his hair in braids. *Id.* at *3, 10. The Nellum Group Home care worker Brian Gary testified that he never knew Tabb to wear braids but that Pittard often did. The off-duty police officer identified Pittard as the shooter and Brown as the getaway driver. Brown testified, however, that he saw Tabb shoot Gomez, though Brown later recanted that testimony. Another witness

testified that Tabb was not the shooter, while yet another testified that Tabb confessed to her that he shot a rival gang member. Beyond the conflicting eyewitness testimony, no physical evidence tied Tabb to the shooting.

In late 2004, the jury found Tabb guilty on three charges. The trial court sentenced him to consecutive sentences of twelve years for attempted first-degree murder (which was merged with the aggravated battery with a firearm) and four years for aggravated vehicular hijacking. *Tabb I*, 870 N.E.2d at 917. In his direct appeal, the state appellate court vacated his conviction for aggravated battery but affirmed in all other respects. *Id.* at 929–30. One judge dissented on grounds that are not part of this appeal. See *id.* at 930 (Neville, J., dissenting).

### B. *State Post-Conviction Relief*

In 2009, petitioner Tabb filed his operative petition for post-conviction relief in the state trial court. He argued that new evidence established his actual innocence, and he said his trial counsel had been ineffective. *Tabb II*, 2013 WL 3379128, at *4. The trial court granted the State's motion to dismiss and denied Tabb's motion to reconsider. *Id.* at *5. On appeal, the state appellate court remanded, finding that Tabb's allegations of actual innocence warranted an evidentiary hearing. *Id.*, citing *People v. Tabb*, No. 1-09-2904 (Ill. App. 2011) (unpublished).[1]

---

[1] To support his claim of actual innocence, Tabb submitted four affidavits with his post-conviction relief petition, from Betty Stuckey, David Carr, Isaac Pittard, and Cynthia Estes. Stuckey was a bystander witness to the shooting. She testified that she was able to see clearly the face of the shooter and that the shooter was not Tabb. *Tabb II*, 2013 WL 3379128, at *4. Carr, Stuckey's son, gave a similar account of the shooting and claimed that Tabb was neither the shooter nor at the scene. *Id.* Estes claimed that

In May 2011, on remand to the state trial court, Tabb filed a motion for limited post-conviction discovery. He requested any "written notes relating to, or recordings of, interviews of witnesses named in Defendant's Amended Post-Conviction Petition." *Id.* at *5. A defense investigator had spoken with Gomez's wife Nelly and reported that she would testify that her husband had seen a photograph of Tabb prior to the lineup and that a police officer confirmed Gomez's identification of Tabb after the lineup. The defense sought interview notes from state investigators who had also spoken to Mrs. Gomez after the defense investigator did so. In October 2011, before the evidentiary hearing, Tabb requested sanctions, asserting that the State had not complied with the request and that the interview notes upon which the state investigators based their final reports had been destroyed. *Id.* at *5–6. The court did not impose sanctions but did instruct the State to instruct investigators to keep any future interview notes in the case.

At the evidentiary hearing, Mrs. Gomez testified about the lineup identification. She accompanied her husband to the police station on the night of the lineup. *Id.* at *7. She waited at a desk while an officer escorted her husband to the lineup. She testified that a few desks over, she saw a stack of files. On the top of the stack was a photograph of a person's face. She

---

in 2008 Brown told her and an attorney that he was "100%" positive that Tabb was not the shooter, recanting his earlier testimony that Tabb was the shooter. However, Brown refused to sign an affidavit saying the same. *Id.* at *5. Pittard changed his story, too, asserting that only he and Brown were together at the time of the shooting, and Tabb was not at the scene. He said he had lied to the police about Tabb's involvement so that he would not be blamed for the shooting. *Id.*

reported feeling mad and having a sick feeling about the picture. *Id.* But it was not until Salvador and the police officer returned from the lineup that she learned the identity of the person in the photograph. Mr. Gomez told his wife that he had identified the shooter. The accompanying police officer obliged Mrs. Gomez's request to see a photograph of the man her husband identified—the same photograph that had given her a sick feeling—and it was a picture of Tabb. *Id.*[2]

The state trial court denied relief at the close of the evidentiary hearing. The state appellate court affirmed. It found that the "evidence at defendant's original trial was overwhelming," relying on the identifications of Gomez, Brown, and Pittard—despite each of those being called into question, and the testimony of Yvonne Ford, who suffered from credibility issues. *Id.* at *11. The court said that Tabb's new witnesses were not reliable and their testimony would probably not "change the result on retrial." *Id.* at *14.

C. *Federal Habeas Corpus Petition*

Having exhausted state court remedies, Tabb sought federal relief. In 2014, he filed a habeas corpus petition under 28 U.S.C. § 2254 raising four claims for relief: "(1) the state violated Tabb's Constitutional rights by withholding exculpatory information and evidence of an improper and suggestive lineup … ; (2) the state destroyed, in bad faith, potentially useful evidence of the tainted lineup and independent eyewitness testimony that Tabb was not the shooter; (3) the state violated Tabb's rights by destroying, in bad faith, potentially

---

[2] The state court did not permit the defense to present expert testimony on the reliability of Gomez's identification or scientific research on eyewitness memory. *Tabb II*, 2013 WL 3379128, at *6.

useful … interviews; and (4) absent the Constitutional violations … Tabb would have been able to establish his innocence." *Tabb v. Butler* (*Tabb III*), No. 14-cv-2023, 2016 WL 1056657, at *3 (N.D. Ill. Mar. 17, 2016). The district court allowed Tabb to take discovery regarding the potentially tainted lineup and the destruction of notes. The district court's ultimate denial of summary judgment relied on the parties' post-discovery statements of undisputed material facts.

The district court found that Tabb had procedurally defaulted the *Brady* claim. Tabb did not raise the "operative facts and controlling legal principles" for his *Brady* claim until he filed his post-conviction petition for leave to appeal and thus did not "fairly preserve this issue." *Id.* at *4. The district court, however, found that Tabb's default should be excused because he was unaware of the possible claim until Mrs. Gomez allegedly informed his investigators that the lineup had been tainted, and because actual prejudice could have resulted from the concealment of a purposefully tainted lineup. The court rejected the claim on the merits, however. The district court also denied the *Youngblood* claim, noting an absence of clear Seventh Circuit precedent on whether destruction of evidence for state post-conviction proceedings is within the purview of federal habeas relief. *Id.* at *5–6. The district court applied the deferential standard required by 28 U.S.C. § 2254(d)–(e), finding that the state appellate court did not make an unreasonable determination of law or fact and that the *Youngblood* claim failed on the merits. Without an independent constitutional violation, the court found that Tabb's claim of actual innocence was not cognizable. *Id.* at *6. The district court denied habeas relief but granted a certificate of appealablity on whether "*Youngblood* applies to the preservation of evidence in a post-conviction proceeding." *Id.* at *7. We

expanded the certificate of appealability to add the *Brady* claim.

II. *Analysis*

The Supreme Court has repeatedly addressed "what might loosely be called the area of constitutionally guaranteed access to evidence." *Youngblood*, 488 U.S. at 55, quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

*Brady* held that due process requires the prosecution to disclose material evidence favorable to the accused upon a defense request, regardless of the good or bad faith of the prosecution. 373 U.S. at 87. The Court extended *Brady* to reach cases where no requests for evidence were made but the evidence "is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed." *United States v. Agurs*, 427 U.S. 97, 110 (1976).

Another related line of cases addresses due process violations when the State destroys exculpatory evidence. In *California v. Trombetta*, 467 U.S. 479, 488–90 (1984), the Court gave three reasons for denying defendants' destruction of evidence claim: the officers acted in good faith, the exculpatory nature was minimal, and the defendants had alternative methods of demonstrating their innocence. In the absence of bad faith, the defendant must show that the destroyed evidence was material and exculpatory. *Id.* at 489. Five years later in *Youngblood*, the Court held that when bad faith is shown, the defendant can succeed on his destruction of evidence claim if the evidence may have exonerated him. *Youngblood*, 488 U.S. at 56–58.

A. *Preliminary Issues*

Before digging into Tabb's due process claims, we address two preliminary issues. First, the State asserts that the federal district court erred in allowing discovery before deciding Tabb's motion for summary judgment. We review the district court's limited grant of discovery for abuse of discretion. *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004), citing *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). As a general rule, federal habeas petitions must be decided on state court records. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). To obtain discovery, the federal petitioner must "(1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show 'good cause' for the discovery." *Hubanks*, 392 F.3d at 933; 28 U.S.C. § 2254(e)(2) (authorizing evidentiary hearings in limited circumstances).

The deposition testimony developed during the federal discovery did not produce the support Tabb needed. That fact does not mean, however, that the district court erred in allowing the discovery. The district court evaluated Tabb's request and concluded that he had "made a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation as to his allegations of a tainted lineup and the destruction of notes, insofar as those notes evidence an allegedly tainted lineup." The court's grant of discovery was sensible and limited to these issues, and the court denied all other discovery requests. The district court did not abuse its discretion.

The second preliminary issue is Tabb's freestanding claim of actual innocence. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal

proceeding." *Herrera v. Collins*, 506 U.S. 390, 390–91, 400 (1993). Whether the constitutional guarantee of due process supports independent claims of actual innocence without any other constitutional violation remains open to debate. See *District Attorney's Office v. Osborne*, 557 U.S. 52, 71 (2009) (question remains open); *House v. Bell*, 547 U.S. 518, 554–55 (2006) (same); *In re Davis*, 557 U.S. 952 (2009) (mem.) (Stevens, J., concurring) (same); *Bradford v. Brown*, 831 F.3d 902, 917 n.7 (7th Cir. 2016) (Hamilton, J., dissenting) (same).

We acknowledge that it is possible that Tabb, despite his conviction, is actually innocent of shooting Salvador Gomez. The case against Tabb depended entirely on the accuracy of Mr. Gomez's identification. Such identifications of strangers in quick, high-stress encounters are often mistaken, and some other witnesses' accounts support Tabb's claim of innocence. If the federal courts will recognize freestanding constitutional claims of actual innocence, however, it is clear that evidence of innocence will need to meet an "extraordinarily high" threshold. *Herrera*, 506 U.S. at 392, 417. Tabb's evidence is not strong enough for this case to break that new constitutional ground. He has called his conviction into doubt, but he has not offered objective and highly reliable evidence of actual innocence. Thus, Tabb would be entitled to habeas relief only if he could establish an independent constitutional violation. He cannot, for reasons we now explain.

B. *Standard of Review*

This habeas case is unusual in that the petitioner was allowed to conduct additional discovery and to supplement the record with deposition testimony relevant to his claims, and he moved for summary judgment. The district court denied both Tabb's motion for summary judgment and the petition

itself, all without a federal evidentiary hearing. Accordingly, our review of the district court's decision is *de novo*. See, e.g., *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016); *Stitts v. Wilson*, 713 F.3d 887, 891 (7th Cir. 2013).

C.  *Brady Claim*

To establish a *Brady* violation, the petitioner must show that the State suppressed material evidence that was favorable to him. *Brady*, 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999). When the claim at issue was not decided on the merits in state court, we review *de novo*. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

First, the State continues to argue that there is no reason to excuse Tabb's procedural default of this claim in the state courts. We disagree. The general rule is that before a federal court may consider a habeas claim, the petitioner must present the claim fairly in a full round of state court proceedings. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). However, if the petitioner did not do so, the default may be excused when the petitioner shows both cause for the default and actual prejudice, or shows that federal review is needed to prevent a fundamental miscarriage of justice. *Id.* The district court correctly found that Tabb's procedural default should be excused because he demonstrated cause (he was "unaware of the possible claim until Mrs. Gomez allegedly informed his investigators that the lineup was tainted") and actual prejudice ("concealment of a purposefully tainted lineup" could have resulted in actual prejudice). *Tabb III*, 2016 WL 1056657, at *4.

Substantively, Mr. Gomez's lineup identification and testimony were essential to Tabb's conviction. Tabb argues that the

evidence provided by Mrs. Gomez after trial calls into question that crucial identification and testimony. The district court rejected Tabb's *Brady* claim because there is insufficient evidence of a suggestive lineup in which Mr. Gomez saw the photograph of Tabb in the police station before he identified Tabb in the lineup. *Id.* On appeal, Tabb asserts that the possible opportunity to see a photograph of Tabb moments before the lineup and what he claims was the police officer's confirmation that Mr. Gomez had selected the correct suspect in the lineup resulted in an unconstitutionally suggestive lineup. Tabb's *Brady* claim relies on the State's suppression of the facts showing the lineup was unfairly suggestive.

Has Tabb shown that the lineup was actually suggestive? No testimony from Salvador Gomez indicates that it was, but we must also assess Mrs. Gomez's accounts. She first came in contact with Tabb's lawyers in early 2011 while his post-conviction relief petition was pending. An email from a member of Tabb's legal team described a conversation with her, reporting that Mrs. Gomez said "that prior to her husband's lineup identifying Tabb, they were waiting in a room. In that room was a file and [Tabb's] picture was on top of the file just sitting there. They both looked at it," and later, after the lineup, "the police officer told them [] Gomez got his lineup id correct."

If that account were true, such priming of the witness and the later reinforcement of the witness's lineup identification would undermine the independence and reliability of the identification. In that event, Tabb might well be able to establish that Salvador Gomez's identification of him was tainted by an unconstitutionally suggestive lineup. See *Simmons v. United States*, 390 U.S. 377, 383 (1968) (possibility of misidentification would be "heightened if the police indicate to the

witness that they have other evidence that one of the persons pictured committed the crime" and that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals"); cf. *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (witness identification is admissible unless both "the challenged procedure was unduly suggestive" and also the totality of the circumstances indicate that the identification was not "sufficiently reliable to prevent misidentification").

During a follow-up meeting between Mrs. Gomez and two state investigators, however, she gave an account that was not consistent with the report of the defense investigator. One of the state investigators made alterations to a print-out of the email from Tabb's legal team. Based on the conversation between the investigators and Mrs. Gomez, one investigator corrected the statements in the email with handwritten modifications and asked her to initial the changes to signal her approval. She did so. The changes reflect that Mrs. Gomez said that only she, not her husband, saw the photograph of Tabb. The investigator also drew a line through all of the remarks about the police officer confirming the identification, striking them in their entirety, apparently with Mrs. Gomez's blessing.

The state investigators then typed a report from the handwritten notes they took during the interview. Those notes were destroyed after the typed summary report was created. In the final report, the state investigators wrote: "As Nelly [Gomez] was sitting alone, she saw a photograph on a nearby desk." "When Salvador and the detective came to where she was sitting, Nelly learned that Salvador had identified the offender in the line-up. Nelly asked, 'Who was it'. The detective then went to the picture Nelly previously viewed, sitting on a

nearby desk. He showed Nelly the person in the photograph, telling her this was the offender," to indicate the individual Mr. Gomez had identified, not that his identification was correct.

Mrs. Gomez then testified twice: in a state post-conviction evidentiary hearing and in a deposition for the federal habeas petition. In the state hearing, she testified that while she sat alone waiting for her husband to complete the lineup, she saw a photograph of Tabb on a stack of files a few desks over. When she saw the image, she "just had a sick feeling." When her husband returned and told her he had identified his attacker, Mrs. Gomez asked the police officer if he would show her "a picture of the person that tried to kill my husband." The police officer took the image she had previously seen, and said, "Oh, it's right here. Look. This is him." When the defense confronted her, "And you told us … that the police officer told your husband that he selected the right person in the lineup; Is that correct?" Mrs. Gomez responded no.

Mrs. Gomez then provided similar deposition testimony for the federal habeas petition. This time she said that rather than being escorted to the lineup immediately, her husband waited with her before the lineup in the same room where the photograph of Tabb was lying atop a stack of papers. Yet, again she said that she had seen the photograph only while sitting alone after her husband left, and her "sixth sense" gave her an angry, sick feeling about the boy in the image. Again she testified that when her husband returned, she requested to see "a picture of the person that was going to take my husband away." The police officer showed Mrs. Gomez the same photograph she had seen while alone. He told her, "this is him, your husband's assailant."

We must conclude that the petitioner did not prove that the lineup procedures were suggestive. There is no direct evidence that Mr. Gomez was even able to see the photograph of Tabb prior to the lineup, let alone that he actually saw it. There also is no admissible evidence that the police officer confirmed with Mr. and Mrs. Gomez that Salvador had identified the *correct* lineup participant, only that he showed them a photo of the man Salvador identified. Thus, Tabb has not shown that the State suppressed material evidence favorable to the defense because there is no evidence of a suggestive lineup.

D.  *Youngblood Claim*

Tabb also asserts a *Youngblood* claim. Because the claim was decided on the merits in state court, we review the state court decision deferentially. The petitioner must show that the state courts unreasonably applied clearly established federal law or unreasonably determined the facts. 28 U.S.C. § 2254(d); *Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013).

In *Youngblood*, the Supreme Court held that a due process violation may result when the state destroys evidence in bad faith. 488 U.S. at 56 (petitioner must show that exculpatory nature of the destroyed evidence was apparent before destruction and that evidence could not be obtained elsewhere, in addition to bad faith). Youngblood challenged his conviction for child molestation, sexual assault, and kidnapping. *Id.* at 52. The victim's clothing had been stored improperly without refrigeration, so the samples deteriorated. *Id.* at 53. Blood and DNA testing techniques available at the time produced inconclusive results. *Id.* at 54. Yet the victim identified Youngblood as his attacker. *Id.* at 53. Youngblood's defense at trial was that the victim had misidentified him and that if the

clothing had been refrigerated, proper testing would have exonerated him. *Id.* at 54. A jury found Youngblood guilty, but the Arizona Court of Appeals reversed. *Id.* The Supreme Court of the United States reversed in turn and reinstated the conviction because there was no showing of bad faith. *Id.* at 55.[3]

Tabb invites us to decide whether destruction of evidence relevant to state post-conviction proceedings can justify federal habeas relief. In *Trombetta* and *Youngblood*, the issues concerned exculpatory evidence created prior to trial. The evidence at issue here was both created and destroyed during post-conviction proceedings. Other circuits have found that errors in state post-conviction proceedings do not entitle a petitioner to federal habeas relief because the challenges are not challenges to the petitioner's detention. See, e.g., *United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006) ("a delay in post-conviction proceedings does not give rise to an independent due process claim that would justify granting a defendant habeas relief"); *Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) (error committed during state post-conviction proceedings cannot provide basis for federal habeas relief), citing *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986). Here, the interview notes were created and destroyed in the course of discovery during

---

[3] Over a decade later, in 2000, new DNA testing techniques allowed the degraded evidence to be tested, and Youngblood was exonerated. National Registry of Exonerations, *Larry Youngblood*, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3774 (last visited Apr. 3, 2017). In 2002, after the DNA was entered into the national convicted offender database, a different man was convicted of the crime. Innocence Project, *Larry Youngblood*, https://www.innocenceproject.org/cases/larry-youngblood/ (last visited Apr. 28, 2017).

a state collateral proceeding, but the notes were evidence relevant to a possible constitutional violation before trial. We are reluctant to adopt a rule that would permit evidence of a *Brady* violation to be destroyed if evidence of the violation came into being only after direct review. We decline to decide that issue in this case. Assuming relief could be legally available based on destruction of such exculpatory evidence in post-conviction proceedings, Tabb's *Youngblood* claim still fails.

Because the state court adjudicated this claim on the merits and discovery did not yield a new or materially altered claim, the petitioner must demonstrate that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *Warren*, 712 F.3d at 1096. Here, the state court assessed Tabb's *Youngblood* claim in the context of a request for sanctions for the State's failure to comply with the discovery request, and the court articulated the correct standards for analysis. *Tabb II*, 2013 WL 3379128, at *16.

To establish a *Youngblood* violation, petitioner Tabb must show that the government acted in bad faith, that the exculpatory nature of the evidence was apparent, and that the evidence could not be obtained elsewhere. *Youngblood*, 488 U.S. at 56; see also *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011). Tabb has not met that standard.

First, it is undisputed that the State destroyed the handwritten notes taken by state investigators during interviews with new witnesses during the post-conviction discovery process. Second, the state appellate court found that the "defend-

ant has provided no evidence that the destroyed notes contained material exculpatory evidence," nor has the defendant "suggested that the destroyed notes were material or exculpatory at all." *Tabb II*, 2013 WL 3379128, at *16. Rather, investigators destroyed the handwritten notes as typical practice after the notes were typed into summary reports. Without further explanation, the state court determined that the "substance of the handwritten notes" was contained in the summary reports. *Id.* Third, the state court also found that Tabb failed to show bad faith on the part of the government—there was "no evidence that the State destroyed the notes as a result of defendant's discovery request," so there was no evidence of bad faith. *Id.* The federal district court held that "the state court's determination was not contrary to, or an unreasonable application of, clearly established federal law. Nor was there an unreasonable determination of the facts." *Tabb III*, 2016 WL 1056657, at *6. We agree.

First, there is no evidence that the destroyed interview notes contained actual or potentially exculpatory information apparent to the investigators. While we recognize that it is difficult to present evidence of the contents and nature of destroyed evidence, the standard requires more than the destruction itself to support an inference that the evidence was exculpatory. Mrs. Gomez's prior statements were not consistent with some key details in the summary reports, but that does not mean the reports do not accurately reflect her statements to the State investigators. Her state-court and federal deposition testimony after the report was typed is consistent with the report.

Second, the evidence does not show that the notes were destroyed in bad faith. Petitioner Tabb urges us to infer bad

faith from the facts that when the handwritten notes were destroyed, the State knew of the defense discovery request for handwritten notes and that there is no evidence that the State attempted to prevent the destruction of notes. See *Strickler*, 527 U.S. at 280–81 (holding the prosecutor responsible for favorable evidence known only to the investigators). Other evidence points in the opposite direction, and there is no direct evidence of bad faith in this case. The routine practice of destroying notes after their contents were captured in typed reports, while problematic, weighs against a finding of bad faith, and the evidence does not compel a finding that the person who destroyed the notes knew of the defense discovery request.

We simply cannot say that the state court's findings of fact on these points were unreasonable or that the court unreasonably applied clearly established federal law. We agree with the district court that the *Youngblood* claim cannot succeed.

In sum, Tabb has not presented sufficient evidence of a due process violation under *Brady* or *Youngblood*, and his claim of actual innocence also fails. The judgment of the district court denying Tabb's habeas corpus petition is AFFIRMED.