In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1047

CEDRIC CAL,

*Petitioner-Appellant*,

*v.*

JASON GARNETT, Chief of Parole for the Illinois Department of Corrections,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-3834 — **Robert M. Dow, Jr.**, *Judge*.

ARGUED DECEMBER 16, 2020 — DECIDED MARCH 23, 2021

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In 1994 Cedric Cal and Albert Kirkman were convicted in Illinois state court of murder and attempted murder after a shooting left two people dead and a third victim, Willie Johnson, alive but with nine gunshot wounds. Johnson testified at trial and identified Cal and Kirkman as the shooters. Some 15 years later, Johnson recanted, stating under oath that neither Cal nor Kirkman were the

shooters. Cal reacted to Johnson's recantation by seeking re-lief based on a claim of actual innocence. An Illinois court held an evidentiary hearing and—after finding Johnson's recanta-tion implausible and not credible—denied Cal's request for relief. The Illinois Appellate Court affirmed.

Cal then turned to federal court and filed a petition for ha-beas corpus relief invoking 28 U.S.C. § 2254(d)(2) and con-tending that the state court's rejection of Johnson's recanta-tion testimony and denial of his actual innocence claim were based on an unreasonable determination of fact. Our court, however, recently rejected a similar argument from Cal's codefendant, Albert Kirkman, who challenged the exact same state court ruling in his own habeas corpus petition. Although the Illinois Appellate Court's decision is far from flawless, we too deny Cal federal habeas relief.

# I

## A

Around 10:00 p.m. on April 21, 1992, Willie Johnson was hanging out in his front yard with his friends Cedric Herron and Sammy Walker. Two gunmen approached and fired mul-tiple shots. Herron and Walker died at the scene. Johnson suf-fered nine gunshot wounds but survived. At the hospital, Johnson agreed to talk to the police. He identified one of the shooters by his street name "Duke," relayed where Duke lived, and described the car he drove. A few hours later, the police pulled over a vehicle matching Johnson's description and arrested the driver, Albert Kirkman, and the passenger, Cedric Cal, who matched the description of the second shooter. Kirkman initially denied going by the name Duke but eventually admitted it after the police saw the name Duke

tattooed on his left arm. Upon reviewing a photo array at the hospital, Johnson identified Cal and Kirkman as the shooters.

At Cal and Kirkman's joint jury trial, the prosecution called Johnson as its key witness. Johnson again identified Cal and Kirkman as the shooters. His testimony was the only evidence linking Cal and Kirkman to the crime. Johnson testified that on the day of the shooting, his sister Latanya came home crying, so he went outside to confront his neighbor, Keith Ford. Johnson and Ford were members of rival gangs and the two had a history of feuding over the drug turf on their block. Johnson belonged to the Insane Vice Lords, whereas Ford was a high-ranking Regent for the Gangster Disciples. When Johnson approached, Ford was standing outside his own home with five other men, including Duke and another man Johnson would later identify as Cal. A fight broke out between Johnson and the men with Ford. Johnson testified that his two friends Herron and Walker eventually arrived at the scene and joined the fight.

On cross-examination, Johnson denied that the altercation before the shooting involved a drug dispute and instead maintained that the fight started when he confronted Ford about upsetting his sister.

Johnson's then-girlfriend, Latrese Buford, testified on the defendants' behalf and gave a different account of what led to the shooting. She said that the events that transpired before the shooting revolved around disputed drug turf in the neighborhood. According to Buford, prior to the shooting she and Johnson observed one of Herron's "workers" selling drugs in an area claimed by Ford. (Like Johnson, Herron was an Insane Vice Lord.) Soon after, two vans—including one driven by Ford—approached the worker and several men got out of the

vans and began beating up the worker. Ford did not partici-
pate in the fight but gave orders to beat up the man. The fight
lasted until Herron arrived and told Ford to call it off. Buford
testified that when the skirmish was over, Ford approached
Johnson and Buford and warned Johnson "that it could be
dangerous being around Cedric [Herron]" because Herron
was selling drugs on Ford's turf.

Another defense witness, a neighbor, testified that she and
her grandchildren spoke to Cal only a few minutes after the
shooting and that he stood with them observing the crime
scene for 45 minutes—not the reaction expected from some-
one who participated in the shooting. And a third defense wit-
ness testified that a month after the shooting, Johnson told
him that Cal and Kirkman were not the shooters.

The jury found Cal and Kirkman guilty of two counts of
murder, one count of attempted murder, and one count of ag-
gravated battery. The court sentenced each of them to manda-
tory life without parole. The court later reduced Cal's sen-
tence to 60 years, however, because he was 17 at the time of
the crimes, and the Supreme Court has held that mandatory
life sentences for juvenile offenders violate the Eighth
Amendment. See *Miller v. Alabama*, 567 U.S. 460, 465 (2012).
Cal has since been granted supervised release.

The Illinois Appellate Court affirmed Cal's convictions on
direct appeal, and the Illinois Supreme Court denied review.
Since his convictions, Cal has filed four post-conviction peti-
tions in Illinois state court. Only the third petition is relevant
to this appeal.

B

In 2009 Cal asked the Illinois Circuit Court for permission to file a successive post-conviction petition raising an actual innocence claim under the Illinois Constitution. See *People v. Washington*, 665 N.E.2d 1330, 1337 (Ill. 1996) (recognizing a freestanding actual innocence claim as cognizable as a matter of due process). In support of his motion, Cal attached an affidavit that Willie Johnson signed in 2009 recanting his identification of Cal and Kirkman as the shooters. Johnson swore under oath that Keith Ford and an unknown second shooter—but not Cal or Kirkman—were the assailants. Johnson further stated that he had falsely identified Cal and Kirkman before and during the trial because he did not like them, and above all, he was afraid of Ford. Like Cal, Kirkman pursued his own post-conviction actual innocence claim based on Johnson's recantation.

The circuit court granted Cal leave to file the third petition and held a joint evidentiary hearing for Cal and Kirkman in 2011. Johnson stood by his recantation when questioned by the circuit court judge. At the hearing, Johnson denied ever fighting with Cal or Kirkman, but he did admit that on one occasion in April 1992, he walked up to Kirkman, who was selling drugs outside of Johnson's house, and stole his drugs. Johnson knew Kirkman to be a Conservative Vice Lord but believed that Kirkman and Cal were aligned with Ford in the drug trade on the block. Johnson could not recall whether Cal was present at the time he stole Kirkman's drugs and denied having any other disputes with Cal and Kirkman, including any dispute involving his sister.

When asked why he did not initially name Ford as the shooter, Johnson explained that he had lied at trial out of fear

for his own life and for his family's. According to Johnson, when he first identified Cal and Kirkman to the police, he "didn't know if [he] was going to die or not," and his mother and sister had already received threats, which he believed came from Ford. He testified that the threats from Ford started immediately after the shooting—while Johnson was still in the emergency room. Although Johnson believed that Cal and Kirkman were aligned with Ford, he stated that he only feared Ford.

Johnson testified that, although he had considered Cal and Kirkman to be enemies, he did not want them to be convicted. He said that he tried to avoid testifying at trial, hoping that Cal and Kirkman would beat the case if he did not show up. Indeed, the trial record reflects that Johnson failed to appear at trial despite having been subpoenaed. A warrant had to be issued for his arrest before he finally appeared and testified.

At the 2011 hearing, Johnson explained that he chose to come forward with the truth after so many years because he no longer feared Ford. Johnson believed himself safe now that he lived in Texas—far away from Ford and his associates. Johnson also testified that his decision to recant was reinforced by a call he received from Ray Longstreet—an old friend and leader of Johnson's former gang, the Insane Vice Lords—who urged Johnson to "tell the truth" and assured him that Ford would not retaliate. To Johnson's mind, he could trust Longstreet's word because he was a "well-known man in these streets" with "a lot of power."

Johnson's former girlfriend Latrese Buford also testified at the evidentiary hearing. According to Buford, Johnson told her immediately after the 1992 shooting that Duke and Cal were the shooters. Buford relayed that information to the

police after the shooting even though Johnson implored her not to tell anyone. She also claimed that she did not see Johnson—contrary to his testimony at the hearing—make or receive any phone calls while in the emergency room, nor were there any phones present in the emergency room but only in the inpatient rooms. These latter points contradicted Johnson's testimony from the evidentiary hearing, during which he said he received a call while in the emergency room.

The Illinois Circuit Court denied Cal's petition for post-conviction relief, finding Johnson's recantation not credible for three reasons. *First*, the court found Johnson's new testimony internally inconsistent and implausible. For instance, Johnson testified that he received a threatening phone call while in the emergency room after the shooting, but Buford testified that she did not see Johnson receive any calls during her time with him at the hospital. The only telephone available to Johnson at the hospital, Buford recalled, was in the inpatient room, not the emergency room. *Second*, the court found Johnson's stated motive for lying at trial unconvincing. The court concluded that Johnson had little motive to lie when he first implicated Cal and Kirkman at the hospital because, at the time, he thought he was dying and therefore had no reason to do anything other than tell the truth. *Third*, the court disbelieved Johnson's motive for coming forward 15 years after the trial, finding that his decision to recant after receiving a phone call from Ray Longstreet suggests that it was done out of Johnson's gang "alliance and his loyalty with that continuing criminal enterprise [of the Vice Lords]" rather than out of a concern for justice.

The Illinois Appellate Court affirmed, finding Johnson's recantation testimony unreliable because it contained inconsistencies and was implausible.

After the evidentiary hearing, Johnson pleaded guilty to perjury based upon his contradictory testimony at the trial and the evidentiary hearing. The indictment for perjury, however, never specified which of his two statements was false.

## C

Unable to secure relief in state court, Cal filed a federal habeas petition under 28 U.S.C. § 2254. Cal raised what he styled as a freestanding actual innocence claim, claiming that he put forth a "truly persuasive" demonstration of actual innocence in state post-conviction proceedings. He also argued that his continued incarceration constituted a due process violation because his conviction rested solely on irredeemably unreliable evidence—Johnson's now-recanted identification of Cal as one of the shooters. And according to Cal, the factual determinations made by the state court during the post-conviction proceedings were unreasonable.

The district court denied the petition because neither our court nor the Supreme Court has ever recognized the existence of freestanding actual innocence claims in non-capital cases. See *Herrera v. Collins*, 506 U.S. 390 (1993). The district court, however, granted a certificate of appealability on Cal's actual innocence claim. In doing so, the district court stated: "In support of his actual innocence claim, [Cal] has identified favorable facts suggesting that he may be innocent of the crimes for which he is currently incarcerated. Johnson was the only eyewitness who testified at [Cal's] trial; there was no physical evidence tying [Cal] to the shooting. Johnson has

now recanted, and [Cal's] presentation of the facts suggests that the recantation may be reliable."

Cal now appeals.

## II

### A

We review the district court's denial of a habeas petition *de novo*. See *Kirkman v. Thompson*, 958 F.3d 663, 665 (7th Cir. 2020). Like the district court, we begin with the decision of the Illinois Appellate Court—the last state court to consider Cal's claim on the merits in a reasoned opinion. See *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Congress has authorized us to grant habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)–(2). A decision is not unreasonable if "'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A state court's factual determinations are presumed correct, and the petitioner must rebut that presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

Cal invokes § 2254(d)(2) and contends that the Illinois Appellate Court's determination that Johnson's recantation testimony was inconsistent, not credible, and was based on an unreasonable determination of fact. If we agree with Cal, he asks us to take the next step of declaring that he has the right to federal habeas relief because he has brought forth evidence showing that he is actually innocent of murdering Cedric Herron and Sammy Walker and of attempting to murder Johnson.

B

Cal urges us not to defer to the Illinois court's finding that Willie Johnson's recantation lacked credibility. He contends that the state court committed clear factual errors and made irrational inferences. A panel of this court, however, recently rejected a similar argument when it affirmed the denial of habeas relief for Cal's codefendant, Albert Kirkman. See *Kirkman*, 958 F.3d 663. Kirkman brought a federal due process claim, arguing that his conviction was based solely on Johnson's unreliable testimony, that Johnson's recantation was credible, and that the Illinois Appellate Court rested its denial of relief on an unreasonable finding of fact. Reviewing the same state court ruling at issue before us, we viewed the Illinois Appellate Court's decision as controlling because that court did not make an unreasonable determination of fact, and Kirkman "fail[ed] to show clear and convincing evidence that [Johnson's] recantation fifteen years after the trial is true." *Id.* at 665.

After taking our own fresh look at the record, and guided by our decision in *Kirkman*, we reach the same conclusion: the Illinois Appellate Court's factual determinations were not unreasonable, and Cal has failed to show by clear and convincing evidence that Johnson's recantation, some 15 years after trial, is reliable. As we explained in *Kirkman*, the Illinois Appellate Court held that the circuit court properly considered six factors in assessing the credibility of Johnson's recantation: (1) the recantation's internal consistency and inherent plausibility, (2) the plausibility of Johnson's motive for perjuring himself at trial, (3) the plausibility of his motive for coming forward, (4) whether the recantation is against Johnson's interests, (5) the importance of the recanted testimony to the

verdict, and (6) whether other evidence supports or contradicts the recantation. See *id.* at 665–66 (citing *People v. Kirkman*, 2013 IL App (1st) 112362-U, ¶ 13, 2013 WL 3147662 (Ill. App. Ct. 2013) (unpublished)).

As the Illinois Appellate Court also pointed out, the circuit court had the opportunity at the evidentiary hearing to observe Johnson's demeanor and "concluded that the new evidence was not material and would probably not change the result on trial." *Kirkman*, 2013 IL App (1st) 112362-U, ¶ 14. In the end, the Illinois Appellate Court affirmed the circuit court's finding that Johnson's recantation testimony was not credible because his recantation was internally inconsistent and implausible, Johnson had no motivation to lie at trial, and he backpedaled from his trial testimony out of loyalty to his former gang instead of out of concern for justice. See *id.* ¶ 17. Given the highly deferential standard governing federal habeas relief, we echo the conclusion in *Kirkman* that "the circuit court's determination was not unreasonable in light of the evidence." *Kirkman*, 958 F.3d at 666.

That is not to say that the Illinois court's reasoning is immune from criticism. Cal rightly questions parts of the Illinois Appellate Court's decision. For instance, in discrediting Johnson's recantation as internally inconsistent and implausible, the state court focused on small inconsistencies collateral to the main thrust of Johnson's testimony and inferred from them that the entire recantation was false. The state court focused, for example, on the fact that Johnson recalled receiving a call in the emergency room, but his former girlfriend Latrese Buford testified that there was no phone in the emergency room. The state court, moreover, did not account for the fact that Johnson's recantation testimony was against his own

interest—so much so that Johnson brought on himself the en-suing perjury charge, to which he pleaded guilty.

While we acknowledge that Johnson's recantation casts some doubt on Cal's guilt, we are mindful of our prior deci-sion in *Kirkman* and conclude that Cal has failed to rebut by clear and convincing evidence the factual determinations of the Illinois Appellate Court. In the end, any shortcomings by the Illinois Appellate Court do not give rise to a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). This is a difficult standard to meet, and "that is because it was meant to be." *Harrington*, 562 U.S. at 102. And "[i]t bears repeating that even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).

### III

Because Cal is not entitled to relief under § 2254(d)(2), we decline to resolve the open question whether petitioners can obtain habeas relief under § 2254 based upon standalone claims of actual innocence. Before we conclude, however, it warrants mentioning that the claim Cal asks us to recognize presents a very difficult issue and one that the Supreme Court will likely have to answer.

Today's law treats a showing of "actual innocence" as a way for prisoners to overcome procedurally defaulted and time-barred habeas claims. See 28 U.S.C. § 2244(d)(1); *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *Schlup v. Delo*, 513 U.S. 298, 327–29 (1995) (requiring a showing "that it is more likely than not that no reasonable juror would have

convicted [the petitioner] in light of the new evidence"). The "point of the exception is to ensure that 'federal constitutional errors do not result in the incarceration of innocent persons.'" *Perrone v. United States*, 889 F.3d 898, 903 (7th Cir. 2018) (quoting *Herrera*, 506 U.S. at 404). But once the actual innocence exception is satisfied, the petitioner must then identify a constitutional error that infected the trial to warrant habeas relief. See *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018) (explaining that once a petitioner satisfies the actual innocence exception, he "must show that his conviction violates the Constitution, laws, or treaties of the United States" to obtain any habeas relief).

Stated another way, the Supreme Court has never held that actual innocence claims, standing alone—separate and apart from any constitutional error—could support habeas relief. See *Herrera*, 506 U.S. at 404–05; see also *McQuiggin*, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Dist. Att'y's Office for the Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether such a federal right [of actual innocence] exists is an open question."); *House v. Bell*, 547 U.S. 518, 554–55 (2006) (declining to "answer the question left open in *Herrera*" about the existence of freestanding actual innocence claims). Nor has our court ever acknowledged such a claim. See *Arnold*, 901 F.3d at 837 (explaining that we have never "indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a noncapital case"); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017) ("Whether the constitutional guarantee of due process supports independent claims of actual innocence without any other constitutional violation remains open to debate.").

Many of our sister circuits have similarly grappled with the issue. Compare *Raulerson v. Warden*, 928 F.3d 987, 1004 (11th Cir. 2019) ("[O]ur precedent forecloses habeas relief based on a prisoner's assertion that he is actually innocent of the crime of conviction 'absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" (citation omitted)), *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019) ("We have thus held that actual innocence does not constitute a freestanding basis for habeas relief."), *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("[W]e have repeatedly indicated that such claims [of actual innocence] are not cognizable on habeas."), and *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) ("The Fifth Circuit has … held that claims of actual innocence are not cognizable on federal habeas review."), with *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable.").

To be sure, the Supreme Court has suggested (without definitively holding) that claims of actual innocence may be enough to justify collateral relief in *capital* cases on the theory that executing an actually innocent person violates the Eighth Amendment. See *Herrera*, 506 U.S. at 405, 417; accord *In re Davis*, 557 U.S. 952, 130 S. Ct. 1, 1–2 (2009) (mem.) (Stevens, J., concurring) ("[D]ecisions of this Court clearly support the proposition that it 'would be an atrocious violation of our Constitution and the principles upon which it is based' to execute an innocent person."). But Cal, of course, is not a capital defendant. He received a 60-year sentence and is now on supervised release. And in any event, we need not exercise our own independent judgment about whether actual innocence

claims are cognizable because Cal (much like his codefendant Albert Kirkman) has not cleared the initial § 2254(d)(2) hurdle of showing that the Illinois Appellate Court grounded its rejection of his request for relief in an unreasonable determination of the facts.

For these reasons, we AFFIRM.