**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-278**

———————

In re: WELDON W. STEWART, JR.,

      Movant.

———————

On Motion for Authorization to File Successive 28 U.S.C. § 2254 Petition in the United States District Court for the District of South Carolina, at Anderson.

———————

Argued:  January 26, 2023                      Decided:  August 21, 2023

———————

Before GREGORY, HARRIS and QUATTLEBAUM, Circuit Judges.

———————

Motion denied by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Harris joins. Judge Gregory concurs in part and in the judgment.

———————

**ARGUED:** Ciara Barone, Walker Fortenberry, UNIVERSITY OF VIRGINIA LAW SCHOOL, Charlottesville, Virginia, for Movant. Melody Jane Brown, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Respondent.  **ON BRIEF:** Dawinder Sidhu, HOPWOOD & SINGHAL PLLC, Potomac, Maryland, for Movant. Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Respondent.

———————

QUATTLEBAUM, Circuit Judge:

A South Carolina jury convicted Weldon Stewart of voluntary manslaughter concerning the death of his girlfriend. Almost 20 years later—following three rounds of collateral litigation in state court and one 28 U.S.C. § 2254 habeas petition in federal court—Stewart seeks permission to file a second § 2254 petition. In that application, Stewart claims he now remembers that his girlfriend died by suicide. According to Stewart, his memory was repressed at the time of his trial and his regained memory satisfies the rigorous newly discovered evidence requirements of 28 U.S.C. § 2244(b)(2)(B), allowing him to file a second habeas petition. One of those requirements is that Stewart demonstrate, by clear and convincing evidence, that no reasonable factfinder, considering his alleged regained memory with the rest of the evidence, would find Stewart guilty of manslaughter. Because Stewart fails to meet this burden, we deny his application to file a successive § 2254 habeas petition.

I.

A.

On December 6, 2000, Stewart—who was 19 at the time—called the police to report that he had burned the body of his 15-year-old girlfriend C.A. Responding to the call, police officers discovered that C.A. was dead and her body had, in fact, been burned. In 2002, Stewart was indicted in Marlboro County, South Carolina, for murdering C.A. and then burning her body. He pled guilty to desecration but went to trial on the murder charge.

2

Stewart, despite repeated inquiries from the trial court about appointing counsel, decided to represent himself at trial. The trial court then conducted a hearing to evaluate Stewart's competency to stand trial. Relying on expert forensic psychiatrist testimony, the court found Stewart competent and thus allowed him to represent himself. But the court appointed the public defender as standby counsel for Stewart should he need or request assistance.

At trial, the state's forensic pathologist testified that C.A. died from blunt force trauma to the head before she was burned. He based this opinion on fractures to the skull and evidence of bleeding near the fractures. The evidence of bleeding, he explained, indicated the injuries occurred before the fire. On cross-examination, the pathologist agreed that the skull fracture could have resulted from a fall but said it was unlikely. He concluded that the skull fracture came from something hitting the victim's skull hard or her skull hitting something with great force.

The state called several police officers. The officers testified that they responded to a call for police aid from Stewart after he burned the body. When they arrived, Stewart told them about the fire. The officers testified that Stewart said he and C.A. had an argument that night and that she fell, went limp and made unusual sounds. Stewart also told them he left the victim after she started making those noises to grab a flashlight from his home. By the time he returned, Stewart continued, she was no longer breathing.

Along with these statements that Stewart made to the responding officers, an officer testified that Stewart delivered letters to the police describing being "overcome with rage"

because C.A. was involved with another man. J.A. 572–73. One of the letters was admitted into evidence. Written in third person, it provides:

> And she saw his rage and he knew he had learned of that which had taken place and was sore [sic] afraid. And his heart was hardened toward her, and he sought to slay her. Yet she loved him still and made haste to meet him in the night to calm his rage. He would have her to commit fornication, but she would not and in his madness, he went in unto her by force. She pleaded with him to have his way with her, but spare her life. He would not take heed and struck her in the face with his right hand, and in his madness laid his hand upon her neck and slew her. When he saw that which he had done, it greatly pleased him.
>
> . . . .
>
> He went into his house to take rest and in the seventh hour, he arose and built an alter so that he could make a burnt offering. And he found that which was for the offering caught in some bushes. And he prepared her, and in the eleventh hour, seven hours after the slaughter, he placed her on the alter. He anointed her with oil and sang and danced praises for the offering. And when he had done this, he looked towards the sky and stretched forth his hands. That he held the cloth he had taken out of the temple, and a great fire came down from the sky and lit the cloth. He then cried out with a loud voice and placed the burning cloth on the alter. As the sacrifice burnt, the smoke reached the sky and he knew that it was good. He was greatly pleased with what he had done and sang and danced and gave thanks. He sacrificed her that she may be forgiven for her sins.

J.A. 573:17–74:24.

The state also called Anthony Watson, a classmate of C.A. who was in a relationship with her when she died. Watson testified that Stewart called him multiple times threatening him. In one of these threatening phone calls, which occurred while Stewart was in jail, Stewart stated Watson was "next." J.A. 421–22.

In response, Stewart insisted C.A.'s death was accidental. He testified in detail about what happened on December 6, 2000. C.A., he said, snuck out of her house to meet Stewart for sex. Later, as he was walking C.A. home through a path in the woods, they began to

4

argue. Stewart told the jury that C.A. pulled out a box cutter and swung it at him. So, Stewart picked her up and started to carry her home. But according to Stewart, as he picked her up, he tripped and fell. He said he fell on top of C.A. Stewart recalled that she initially sat up, but then began calling Stewart's name. He said her voice became low and that she made "strange sounds" that "didn't sound human." J.A. 937–38. Then Stewart testified that he saw blood coming from C.A.'s mouth. He knew at that point something was wrong, so he left to find his friend Stanton Wright.

Stewart testified that he was drinking a beer and looking for cigarettes when he found Wright. And he claimed he told Wright about tripping and falling on C.A. Wright, however, previously signed a statement saying that Stewart told him that C.A. had sex with someone else before their encounter and did not shower before meeting him. According to the statement, Stewart "flipped" out when he learned this. J.A. 311.

Stewart also relied on his statements to the authorities, the lack of evidence of a struggle and the testimony of witnesses that said Stewart was not violent towards C.A. And he pointed out that the state's case lacked a murder weapon.

After all the evidence was presented, the jury found Stewart guilty of the lesser included charge of voluntary manslaughter. The trial court sentenced Stewart to 30 years' imprisonment for that charge, and 9 years on the desecration of human remains charge to run consecutively. Later, the South Carolina Court of Appeals dismissed his direct appeal.

## B.

Stewart then began a series of collateral challenges to his conviction. In 2006, he sought post-conviction relief in South Carolina state court, arguing he received ineffective

5

assistance from his appellate counsel. He complained that his counsel did not effectively challenge the trial court's voluntary manslaughter charge, the authentication of the letters the state introduced or the admission of graphic photographs of the victim's charred remains. He also argued that the trial court erred by admitting Wright's testimony over his hearsay objections. The state post-conviction relief ("PCR") court rejected those claims, and the South Carolina Supreme Court then denied his petition for a writ of certiorari.

Next, in 2009, Stewart filed his first § 2254 habeas petition in federal court. In that petition, he claimed the trial court's failure to include an involuntary manslaughter charge he proposed violated his due process rights and repeated the ineffective assistance of counsel claims he lodged in state PCR court. The district court dismissed the petition as a matter of law. First, it held that the trial court's rejection of the jury instruction Stewart requested was not an unreasonable application of federal law as established by the Supreme Court. Second, the court held that Stewart's appellate counsel's failure to raise the ineffectiveness of trial counsel did not fall below the applicable standard of professional care nor was it sufficiently prejudicial under *Strickland v. Washington*, 466 U.S. 668 (1984). Stewart appealed the district court's order and we denied his motion for certification and dismissed his appeal. *Stewart v. Bodison*, 412 Fed. App'x. 633 (4th Cir. 2011).

In 2015, Stewart went back to state trial court. He moved for a new trial, arguing a juror from his criminal trial failed to report a relationship with him, the pathologist who testified for the state at trial was not qualified and, for the first time, that he had regained memory that C.A. actually died by suicide. Stewart claimed in March 2014, he began

6

communicating with Lori Stewart, his then acquaintance and now wife, on the online social network known as Tango. According to Stewart, during their subsequent conversations, the memories suddenly came back to him.[1] He alleged that he remembered that on December 6, 2000, C.A. was depressed about the one-year anniversary of having an abortion. While they were in the woods, she collapsed in Stewart's arms. Stewart recalled that "my mouth was on her mouth as she took her last breath; I felt her spirit leaving her body." J.A. 1009.1. Stewart claimed he panicked, went to buy some gas and returned to burn C.A.'s body. Stewart and his counsel later abandoned this repressed memory claim. The state court denied relief on the two grounds that Stewart pressed. [2]

Then, in 2018, Stewart sought discovery and additional post-conviction relief before the state PCR court. He alleged that the state withheld the pathologist's statements that he could not rule out that C.A.'s head injuries were caused by the fire rather than blunt force trauma. Stewart also alleged that the state failed to turn over notes from its investigators about the lack of any evidence of a struggle in the woods. The state PCR court rejected

---

[1] The record is unclear as to when Stewart allegedly regained his memory. At one point, he says it was in March 2014. At another point, he says it was in June 2014. Lori says it was July 1, 2014. In addition, Stewart initially told Lori his name was Ben and he was a real estate developer from California. He later came clean after which Stewart allegedly told Lori that C.A. died by suicide. Lori, a 20-plus year FBI employee, then began to investigate Stewart's story. The FBI fired her after her security clearance was revoked due to her association with Stewart. Since Stewart was a convicted felon, that association presented a potential conflict of interest. According to Stewart, Lori's attorney advised her that if Stewart were exonerated, that would give her the best chance of successfully appealing her dismissal from the FBI.

[2] Stewart filed the motion as to the regained memory pro se. But he was represented by counsel when that ground was abandoned.

those claims, finding that neither the pathologist's statements nor the notes were newly

discovered. In fact, the court ruled that Stewart had the information at the time of his trial

in 2003.

Stewart also raised again his regained memory that C.A. died by suicide. The state

PCR court rejected this claim as well. It held:

> That Applicant now seeks to change his story and assert that [C.A.] perished
> from suicide, and not in the fashion testified to at trial, is inconsequential.
> Whether newly-discovered evidence is material, and whether it would
> change the outcome at trial, is considered in the context of the other evidence
> presented *at trial*, and not in the context of the self-serving, unsupported, and
> vague "alternative facts" presented by the convicted individual long after
> trial. Given Applicant's conspicuous lack of detail, it is evident to this Court
> that he seeks to secure a different pathological finding, and amend his
> memory to fit it, so many years beyond the original killing that the State
> would struggle to disprove him.

J.A. 1296 (emphasis in original). And the court added, "[c]uriously and importantly,

[Stewart] does not appear to indicate how [C.A.] allegedly killed herself, and did not offer

any further detail at the hearing." J.A. 1296 n.3. Thus, it concluded that the alleged new

evidence "would not change the outcome of [the] trial." J.A. 1296.

C.

That brings us to Stewart's current application for pre-authorization to file a

successive § 2254 habeas petition. In October 2021, proceeding pro se, Stewart asserted

that, if authorized, he will submit three claims alleging constitutional error that essentially

track his claims the last time he sought relief in state court. Those claims are:

> (1) Newly discovered *Brady* violation committed by the State by concealing
> evidence establishing that the injury alleged by the State to have caused
> Victim's death was an injury created after death.

8

(2) Newly discovered evidence establishing that the State failed to correct false testimony given by the State's pathologist and that the State suppressed evidence proving that this testimony was false.

(3) Newly discovered *Brady* violation committed by the State by withholding notes written by the State's crime scene investigator detailing observations made by the investigator while on the scene which contradicted the State's case against Stewart at trial.

ECF No. 2.

Stewart did not list his regained memory as a ground for filing a successive § 2254 habeas petition. But he discussed that issue in his application. So, construing his pro se petition liberally, we appointed counsel to represent him and requested briefing on whether the recovery of his allegedly repressed memory could serve as newly discovered evidence permitting a successive habeas petition under 28 U.S.C. § 2244(b).

II.

A.

We start with some basics about successive applications for habeas relief under 28 U.S.C. § 2254. Generally, a state prisoner is entitled to only one federal challenge. *In re Stevens*, 956 F.3d 229, 232 (4th Cir. 2020). "For any successive federal habeas application, [the Antiterrorism and Effective Death Penalty Act or 'AEDPA'] requires a prisoner to meet strict procedural and substantive gate-keeping requirements before federal courts can reach the merits of that successive application." *Id.* (citing *Panetti v. Quarterman*, 551 U.S. 930, 942–47 (2007)). Those requirements are found in 28 U.S.C. § 2244.

9

Under § 2244, a successive applicant must "move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). A claim "presented in a prior application" for relief under § 2254 "shall be dismissed." *Id.* § 2244(b)(1). And even if not previously presented, a claim must be dismissed unless it satisfies one of two requirements. The first is for new constitutional rules: the applicant must show "that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *Id.* § 2244(b)(2)(A). The second addresses claims based on newly discovered facts and has two parts:

(i)   the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii)  the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* § 2244(b)(2)(B).

To obtain authorization to file a successive federal habeas claim, the petitioner need not convince the court he will ultimately satisfy the provision's demands. *Stevens*, 956 F.3d at 233. He need only make a prima facie showing to pursue his requested second claim. *In re Hubbard*, 825 F.3d 225, 229 (4th Cir. 2016). An applicant makes such a showing "[i]f in light of the documents submitted with the [motion for pre-filing authorization] it appears reasonably likely that the [motion] satisfies the stringent requirements for the filing of a second or successive petition." *In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003).

10

B.

With that background in mind, we turn to Stewart's claim that he has recovered previously repressed memories about the night C.A. died. According to Stewart, his trial testimony that she died as a result of him accidentally falling on top of her was not true. Instead, he now remembers that she died by suicide. Stewart insists that his regained memory is newly discovered evidence that shows he is actually innocent. He further argues the evidence was not previously available because the trauma of seeing C.A. kill herself triggered a condition known as dissociative amnesia. As a result, Stewart claims he repressed his memory of what occurred and developed the version of the events that he testified about at trial.

Stewart maintains that his new memory is consistent with other evidence from the trial—the fact that December 6, 2000, roughly coincided with the one-year anniversary of C.A. having an abortion, that she left what he calls a suicide note[3] and the absence of evidence of a struggle from the woods where they were last together. Further, he presented a report from a psychologist who stated she currently cannot rule in or rule out whether he suffers from dissociative amnesia, but additional testing might allow her to clarify her opinions.[4]

---

[3] The pertinent part of the letter reads, "I feel like I want to kill myself, but why should I and you wouldn't even care if I did. I can't cope with the pain anymore. If I'm at the point [of] thinkin[g] about killing myself, it is not good . . . . This pain hurts so much . . . . [T]his pain is nothing I can handle anymore." J.A. 1143, 1204–09.

[4] The psychologist's report indicates that Stewart's counsel declined to pursue the evidence-based tests she recommended, opting instead for a preliminary evaluation.

No federal court that we know of has ever held that regained memory that was previously repressed constitutes newly discovered evidence for purposes of federal habeas relief. True, some state and federal district courts have recognized that dissociative amnesia exists and that individuals may have repressed memories as a result.[5] But all the cases Stewart cites are civil sexual assault claims where the victims used alleged repressed memories to argue for equitable tolling of a statute of limitation. Stewart asks us to break new ground.

Aside from being novel, Stewart's claim implicates several significant issues. The issues vary somewhat based on the way Stewart frames his argument that the newly discovered evidence of his previously repressed memory shows that he is actually innocent. At times, he appears to frame the newly discovered evidence as a procedural gateway for the consideration of the three substantive constitutional claims identified above. At other times, he appears to frame the newly discovered evidence as an independent substantive ground for habeas relief. Giving Stewart the benefit of the doubt, we will consider both frameworks.

---

[5] *See, e.g.*, *Moriarty v. Garden Sanctuary Church of God*, 511 S.E.2d 699 (S.C. 1999); *see also Templeton v. Bishop of Charleston*, No. 2:18-cv-02003-DCN, 2021 WL 3419442 (D.S.C. Aug. 5, 2021); *Clark v. Edison*, 881 F. Supp. 2d 192 (D. Mass. 2012), *Shahzade v. Gregory*, 923 F. Supp. 286 (D. Mass. 1996); *Isley v. Capuchin Province*, 877 F. Supp. 1055 (E.D. Mich. 1995); *Doe v. Freeburg Cmty. Consol. Sch. Dist. No. 70*, No. 10-cv-458-JPG, 2012 WL 3996826 (S.D. Ill. Sept. 12, 2012); *Anonymous v. Vella*, No. 8:04CV269, 2006 WL 1401680 (D. Neb. May 15, 2006).

1.

A habeas petitioner may generally use alleged newly discovered evidence of actual innocence as a gateway for the consideration of otherwise procedurally barred claims. *See e.g.*, *Schlup v. Delo*, 513 U.S. 298, 314 (1995) (allowing a claim of actual innocence to avoid the procedural bar to considering the constitutional errors of ineffective assistance of counsel and improper withholding of evidence by the prosecution); *McQuiggin v. Perkins*, 569 U.S. 383, 396–98 (2013) (holding that evidence of actual innocence may serve as a gateway for a habeas petitioner to pass through the statute of limitations procedural bar to asserting an unconstitutional ineffective assistance of counsel claim).[6]

Even so, Stewart faces a potential statute of limitations issue. At the latest, Stewart claims to have regained his memory on July 1, 2014. After that, he moved for a new trial in the state trial court on April 6, 2015, in part due to his regained memory. But he abandoned that argument, and the court denied his motion on the other grounds on May 26, 2015. Stewart raised his repressed memory again in filing for discovery and other relief from the state PCR court on May 25, 2018. That motion was denied on October 15, 2019, and his appeal of that denial was dismissed on August 8, 2020. Then, on October 10, 2021, over a year later, Stewart filed the motion before us today. Section 2244(d)(1)(D), imposes a "1-year period of limitation" from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." The timeline raises serious questions about Stewart's compliance with this statute of

---

[6] Our court has likewise approved this type of claim. *See, e.g.*, *Finch v. McKoy*, 914 F.3d 292, 294 (4th Cir. 2019).

limitations, but the parties did not address this issue in their briefs. For that reason, we decline to address it.

Proceeding then to Stewart's claim, as discussed earlier, it must be "reasonably likely" from the motion for pre-filing authorization that "the stringent requirements for the filing of a second or successive petition" will be satisfied. *In re Williams*, 330 F.3d at 281. And for a successive § 2254 petition based on newly discovered evidence, one of those stringent requirements is that the evidence, when viewed together with all the other evidence, must be sufficient to establish by clear and convincing evidence that "no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B).

*In re Williams* illustrates this requirement. There, a witness testified at trial that he saw Williams shoot at the vehicle in which the witness was a passenger—killing one occupant and injuring another. *In re Williams*, 330 F.3d 330 at 278. Years after Williams was convicted, he applied to file a successive habeas application under § 2244(b). *Id.* at 279. In his application, Williams alleged that the witness recanted his trial testimony, establishing his innocence. *Id.* We, however, rejected the application concluding that while the witness' recantation supported Williams' assertion of innocence, it did not outweigh the other incriminating evidence. *Id.* at 283–84.

The same is true here. To be sure, Stewart's claim of dissociative amnesia, if accepted as true, provides some support for his claim of innocence. And the record contains other evidence that could be consistent with Stewart's alleged memory that C.A. died by

14

suicide. For example, there was no evidence of a violent struggle between Stewart and C.A., and C.A. did write a note expressing suicidal thoughts near the time of her death.

But the absence of evidence of a struggle is not inconsistent with the state's theory that Stewart killed C.A. by blunt force trauma. And while C.A.'s note contained suicidal thoughts, it did not say she intended to kill herself.

Also, although Stewart says he now remembers C.A. died by suicide, he has not provided any details. For example, he has not explained how she did it.[7] In contrast, Stewart provided detailed testimony at trial about how he tripped and fell on top of C.A. That sworn testimony, which Stewart now claims to be untrue, must be considered along with his alleged regained memory.

Next, the first time this regained memory came up was to a woman he met online while he was in prison. This same woman is now his wife. Stewart's own filings in the collateral state proceedings undermine his alleged regained memory. Stewart maintained in state court that Lori lost her job with the FBI based on her association with him and that her attorney advised the best chance at contesting the dismissal was for Stewart to be exonerated.

And last, the state presented substantial evidence that Stewart killed C.A. before burning her. That evidence includes the pathologist's testimony that C.A. died from blunt force trauma before she was burned; the letter Stewart sent to one of the police officers

---

[7] Lori stated in her interview with the consulting psychologist that Stewart told her C.A. may have ingested a pill that caused her death. She added that Stewart told her C.A. asked for some water before she died, leading him to believe that she had taken a pill.

15

indicating his anger about her being in a relationship with someone else and reporting violent acts and/or intentions; Wright's statement to the police that Stewart "flipped" after learning that she had sex with someone else before their encounter and did not shower afterwards; and Watson's testimony that Stewart threatened to harm him due to his relationship with C.A. And we cannot forget that Stewart admitted to burning C.A.'s remains. All this evidence undermines the plausibility of his current story.

In sum, considering the problems with the evidence Stewart offers and the other evidence supporting the prosecution's theory that he killed C.A., Stewart cannot make the required prima facie showing. Even considering Stewart's testimony about his regained memory, we cannot conclude that it is reasonably likely to persuade a district court that no jury could find the applicant guilty of the underlying offense. 28 U.S.C. § 2244(b)(2)(B).[8]

In reaching this conclusion, we are mindful that under *Hubbard*, Stewart need only make a prima facie showing that he satisfies the requirements of § 2244. But Stewart has not satisfied the standard for a prima facia showing that *In re Williams* established.

---

[8] This analysis does not even include the likely countervailing evidence that any presentation of dissociative amnesia would face. For example, the medical authority underlying Stewart's claim, at least at this point, seems unsettled. On the one hand, the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 338 (5th ed. text rev. 2022) includes "dissociative amnesia" as a dissociative disorder, the defining feature of which is "an inability to recall important autobiographical information that 1) should be successfully stored in memory and 2) ordinarily would be freely remembered []." On the other, some medical research calls into question the accuracy and reliability of alleged recovered memories. *See* Ivan Mangiulli et al., *Running Head: A Critical Review of Dissociative Amnesia*, 10 Clinical Psych. Sci. 191 (2021) ("[R]eports of dissociative amnesia can be easily malingered . . . approximately 20% of violent offenders claim amnesia for their crimes (e.g., sexual assault, homicide[)]") (reviewing relevant literature).

2.

Stewart also seems to argue that the newly discovered evidence of his previously repressed memory shows that he is actually innocent as an independent substantive ground for habeas relief. This argument faces the same statute of limitations issue already discussed. Additionally, even before considering the new evidence in the context of the record as a whole, Stewart's use of this framework faces two preliminary hurdles.

a.

First, as the state points out, Stewart did not list his regained memory as a substantive ground for relief. As noted above, he outlined three specific grounds that largely followed the grounds he pursued in his last state court proceeding. None of those grounds mention anything about regained memory or repressed memory. True, later in his application, Stewart discusses his repressed memory and regaining it. But, according to the state, that discussion is not framed as a substantive ground for relief but rather as a reason for us to overlook the procedural bars that would otherwise preclude the three grounds he specified in his habeas relief petition. So, for Stewart to prevail, we must look past his failure to list newly discovered evidence based on repressed memory as a specific ground for habeas relief.

b.

Second, § 2244 requires that for a successive petition based on newly discovered evidence, "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Stewart initially asserts that his recovered memory indicates he is actually innocent, and that it is a

17

constitutional error to imprison an innocent person. The problem with that argument, however, is that neither the Supreme Court nor our court has ever permitted federal habeas relief on a claim of actual innocence "based on newly discovered evidence . . . absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).[9] In fact, some courts, reading

---

[9] This remains true 30 years after *Herrera*. *See, e.g.*, *United States v. MacDonald*, 911 F.3d 723, 798 (4th Cir. 2018) (emphasizing that the defendant "faced a daunting burden in establishing his eligibility for relief because of his actual innocence, in that the Supreme Court has never come across any prisoner who could make the extraordinarily high threshold showing for such an assumed right" (internal citations and quotations omitted))*; see also Cosey v. Lilley*, 62 F.4th 74, 86 n.11 (2d Cir. 2023) (stating "that a freestanding innocence claim would be subject to a more demanding standard than the *Schlup* gateway standard"); *Cal v. Garnett*, 991 F.3d 843, 850–51 (7th Cir. 2021) (emphasizing that "the Supreme Court has never held that actual innocence claims, standing alone—separate and apart from any constitutional error—could support habeas relief" and that the Seventh Circuit has not acknowledged such); *In re Dailey*, 949 F.3d 553, 557 (11th Cir. 2020) (assuming, but not deciding, that a freestanding actual innocence is viable, and holding the petitioner would be unable to satisfy the standard for actual innocence set forth in *Herrera*); *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019) ("[A]ctual innocence does not constitute a freestanding basis for habeas relief."); *Bruce v Warden Lewisburg USP*, 868 F.3d 170, 183–84 (3d Cir. 2017) (explaining that the threshold showing for any freestanding actual innocence claim "would necessarily be extraordinarily high"); *Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014) (holding that if the freestanding actual innocence claim exists, it would require more than the *Schlup* gateway standard); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (recognizing that although the freestanding actual innocence claim may exist, "[w]e have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context"); *Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010) (holding that a freestanding claim of actual innocence is not cognizable on habeas review in a non-capital case); *Pierce v. Lumpkin*, No. 19-40830, 2021 WL 1235454, at *1 (5th Cir. Mar. 10, 2021) (per curiam) (holding that "a freestanding claim of actual innocence is not cognizable on federal habeas review"); *Johnson v. Roden*, No. 16-1419, 2017 WL 4773221, at *2 (1st Cir. Sept. 14, 2017) (noting that the Supreme Court has not resolved whether a freestanding claim of actual innocence may entitle a prisoner to habeas relief)*;but see People v. Coleman*, 996 N.E.2d 617, 634 (Ill. 2013) (holding that although the Supreme Court has not clarified whether a freestanding actual innocence claim is

the text to require a constitutional violation separate from the claim of innocence, characterize § 2244(b)(2)(B)(ii)'s requirements as an "actual innocence plus" standard. *See, e.g.*, *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009). As to this argument, we would have to find a constitutional error not previously recognized in the § 2244 context.

Stewart alternatively insists that the state violated the due process clause of the Fourteenth Amendment by prosecuting him in 2003 while he suffered from dissociative amnesia. According to Stewart, this due process violation satisfies § 2244(b)(2)(B)(ii)'s constitutional error requirement. Citing the Supreme Court's *Dusky v. United States*, 362 U.S. 402 (1960), decision, he argues that due process requires that a defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* at 402. Because of his condition, Stewart contends that he did not have a factual understanding of the events that took place on December 6, 2000. As a result, he could not testify or advise standby counsel that the victim did not die as a result of his falling on the victim or striking her, but that she died by suicide. And Stewart argues our decisions in *United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995), and *United States v. Kendrick*, 331 F.2d. 110 (4th Cir. 1964) (en banc), permit evaluations of a criminal defendant's competency post-trial.

But those cases are different from Stewart's. In *Kendrick*, we vacated a district court's denial of a § 2255 petition that alleged the defendant was incompetent at the time

_____

cognizable in federal habeas, the claim is cognizable based on the Illinois Constitution as a violation of state due process).

19

of his trial and remanded for a competency hearing. 331 F.2d at 111. There was no indication that competency was raised or addressed by the trial court. *Id.* at 111–12. And our decision to vacate the district court's denial was based on the evidence relied on by the district court, not the issues presented here. *Id.* at 112–13. In contrast, the state trial court in Stewart's case conducted an unchallenged competency hearing immediately before trial. Despite that, Stewart claims the due process clause affords him another bite at the apple, over 20 years later.

In *Mason*, we reversed a district court's denial of the defendant's motion for a hearing on a retroactive determination of his competency made after he was convicted but before both the forfeiture phase of his trial and his sentencing. 52 F.3d at 1287. That is a far cry from Stewart's claim that due process requires a court to revisit Stewart's competency almost 20 years after the conclusion of the underlying trial and sentencing when the trial court found him competent after an unchallenged pre-trial hearing. Here, the state trial court held a competency hearing in which expert forensic psychiatrists opined and the court concluded that Stewart was competent prior to the trial. What's more, Stewart does not challenge that determination. Instead, he insists that is not enough. He argues the trial court's competency determination back in 2003 does not establish competency once and for all time. This argument for constitutional error would also involve an extension of current law.[10]

---

[10] The state raises yet another preliminary issue that applies to both Stewart's procedural and substantive arguments. In *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), the Supreme Court held that 28 U.S.C. § 2254(e)(2) prohibits a federal habeas court from

c.

To prevail under this independent substantive ground framework, Stewart must clear those hurdles. But for our purposes today, we need not decide whether Stewart has done so. Even assuming, without deciding, that he has, this claim also fails for the same reasons discussed in Part II, B, 1 above. Considering the evidence Stewart offered in his motion, along with the other evidence in the record, it is not reasonably likely that no reasonable factfinder "would find [Stewart] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

III.

Stewart's motion for authorization to file a successive § 2254 motion for federal habeas relief is,

*DENIED.*

---

conducting evidentiary hearings or otherwise considering evidence not developed in state court based on the ineffective assistance of state postconviction counsel. *Id.* at 1734. But that provision provides an exception if the claim is based on "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). Stewart argues that in applying this provision, we look to the time of Stewart's trial or his first habeas petition. At both times, he continues, his memory that C.A. died by suicide was repressed and thus could not have been discovered. But even accepting Stewart's claim about repressed and regained memory, he recovered his memory in 2014 and pressed the argument that he now remembers C.A. died by suicide in both his 2015 and 2019 collateral state proceedings. So the state argues that we are limited to the record from his state proceedings. Because Stewart's application fails for other reasons, we need not resolve this question.

21

GREGORY, Circuit Judge, concurring in part and concurring in the judgment:

I agree with my friends in the majority that Stewart cannot satisfy the demands of 28 U.S.C. § 2244(b)(2). Given the record evidence pointing to his guilt, it is unlikely that Stewart can "establish by clear and convincing evidence that . . . no reasonable factfinder would have found" him guilty of voluntary manslaughter. § 2244(b)(2)(B)(ii). I write separately, however, to highlight which threshold § 2244(b)(2) requirements Stewart *can* satisfy, and to emphasize that today's decision should not foreclose all future § 2244(b) petitions premised on a theory of dissociative amnesia.

## I.

Almost twenty years ago, the state of South Carolina tried Weldon Stewart for the killing of his girlfriend, C.A., when Stewart and C.A. both were teenagers. When police responded to Stewart's 911 call reporting C.A.'s death, they described Stewart's demeanor as "out of it," "afraid and confused." Pet. Br. App. A at 43. The state argued that Stewart killed C.A. in a fit of rage over C.A.'s romantic infidelity. Stewart, representing himself at trial, claimed that C.A. died after she fell from his arms. He admitted to burning her body, perhaps in a panicked or confused state, after her death. Apparently disbelieving Stewart's story, a jury convicted him of voluntary manslaughter and for the desecration of C.A.'s remains. A judge sentenced Stewart to thirty-nine years in prison.

Nearly ten years ago, Stewart informed a psychologist that he had been mistaken about the tragic events of C.A.'s death. She did not die from falling as he thought. Instead, Stewart explained, C.A. took her own life after struggling with depression stemming from

22

an abortion, which she underwent at just fourteen years old.   Stewart now seeks postconviction relief based on this development.  The discrepancy in his memory, Stewart argues, may have been caused by a state of dissociative amnesia triggered by the trauma of C.A.'s death.  Stewart sought post-conviction relief in state court on this basis, but the court rejected this argument as Stewart's attempt to "amend his memory."  J.A. 1296.  And now that his application for pre-authorization to file a successive habeas petition is before this Court, the majority embraces similar skepticism in denying Stewart that opportunity.

In this case, I share the majority's doubts that Stewart's new explanation can undermine the strong evidence inculpating him in C.A.'s death.  Stewart's new explanation cannot, for example, refute the pathologist who persuasively concluded that a fracture in C.A.'s skull likely came from a blunt instrument striking it.   Nor does Stewart's recollection of grief from witnessing C.A. take her own life explain his decision to burn her body.  And just how did she do it?  Did she ingest a pill as he claims?  To my mind, these questions and the countervailing evidence prove fatal to Stewart's application.

## II.

Nevertheless, whatever misgivings I have about Stewart's case do not vitiate writ large any claim of mental incapacity by criminal defendants who suffer from dissociative amnesia.   Dissociative amnesia is "the inability to recall important autobiographical information, usually of a traumatic or stressful nature, that is inconsistent with ordinary forgetting." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 298 (5th ed. Rev. 2013).  It has been described as a "transient condition" that

23

lasts for a "few minutes" and "lifts spontaneously." *See Zacher v. Graham*, No. 6:14-CV-06027(MAT), 2016 WL 368086, at *5 (W.D.N.Y. Feb. 1, 2016). Such a condition may well be unusual, but "[i]t is clearly within the realm of all human experience to expect that a person would react to a traumatic event and that such reactions would not be consistent or predictable in all persons." *People v. Beckley*, 456 N.W.2d 391, 404 (Mich. 1990).

A proper dissociative amnesia diagnosis may support a successive habeas petition. Before filing those petitions, a prisoner must first "move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). A court of appeals will grant such authorization only in limited, statutorily prescribed circumstances. That is, "[l]eave may be granted only if the proposed habeas petition contains at least one claim that (a) rests on a new rule of constitutional law, made retroactive by the Supreme Court, or (b) rests on a previously undiscoverable factual basis that would demonstrate the applicant's innocence by clear and convincing evidence." *In re Williams*, 444 F.3d 233, 235 (4th Cir. 2006) (citing 28 U.S.C. § 2244(b)(2)). These gatekeeping provisions attempt to balance the grave importance of the constitutional right to habeas corpus against the burden successive petitions place on the federal judicial system. *See Felker v. Turpin*, 518 U.S. 651, 664 (1996); H.R. Rep. No. 104-518, at 111 (1996) (Conf. Rep.) ("[AEDPA] incorporates reforms to curb the abuse of the statutory writ of habeas corpus.").

The court of appeals has a limited role in this regard, however. To receive authorization, an applicant need only "adequately alleg[e]" each element of the relevant § 2244(b)(2) provision to merit authorization. *In re Williams*, 330 F.3d 277, 282 (2003). Thus, the court of appeals serves essentially a box-checking function, *see James v. Walsh*,

24

308 F.3d 162, 169 (2d Cir. 2002), considering only if the petitioner has made a "prima facie showing that the application satisfies the requirements of [§ 2244(b)]," § 2244(b)(3)(C). In other words, a petitioner may receive authorization after presenting "a sufficient showing of *possible merit* to warrant a fuller exploration by the district court." *Williams*, 330 F.3d at 281 (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)) (emphasis added). And "[i]f in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the application." *Bennett*, 119 F.3d at 469–70.

Successful petitioners under § 2244(b)(2)(B) must establish three elements. The claim must be based on new evidence that "could not have been discovered previously through the exercise of due diligence." § 2244(b)(2)(B)(i). Next, "the claim must describe constitutional error." *Williams*, 330 F.3d at 282; *see* § 2244(b)(2)(B)(ii). Finally, the new evidence, "if proven and viewed in light of the evidence as a whole, [must be] sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(B)(ii). Memories recovered from a previous state of amnesia may satisfy each of these elements. But in my opinion, Stewart can only make a prima facie case for the first two elements.

A.

First, recovered memories may qualify as new evidence which "could not have been discovered previously through the exercise of due diligence." § 2244(b)(2)(B)(i). Taking all of an amnesic defendant's alleged recovered memories as true, no measure of diligence

25

would have allowed him to previously "discover" his memories. That is because these repressed memories are usually recovered, if at all, "as a result of therapy or spontaneously . . . months, years, [or] even decades later." Clifford S. Fishman & Anne Toomey McKenna, *Jones on Evidence* § 56:22 (7th ed. 2023).

Stewart's case presents an example. The record reflects that he is no stranger to traumatic or scarring life events. As a child, Stewart was the brunt of severe bullying, which included being "jumped" by ten to fifteen other kids and "almost drowned by neighborhood bullies." Opening Br. at 17. At just fifteen years of age, he witnessed his then-girlfriend "force[] herself into an abortion . . . by drinking cast[o]r oil." J.A. 616. She then had the "baby out on the floor and took pictures of it and sent it to" Stewart. *Id.*

Stewart's battle continued throughout his teenage years. At the request of his current counsel, a doctor interviewed Stewart in a series of psychological evaluations in May 2022 "to explore his likelihood of meeting criteria for dissociative amnesia." Pet. Br. App. A at 1. The report indicates that while Stewart was employed at a Burger King restaurant, he discovered the remains of a partial fetus in a trash can. Stewart's mother also met with the same doctor and reported that following the near drowning by bullies, Stewart's shocking encounter with the partial fetus, and C.A.'s death, he became "distant" after each event and "went into a state like nothing happened." *Id.* at 13. Even more, following his incarceration, Stewart informed the doctor that while he was on suicide watch, he faced repeated periods of "black outs." *Id.* at 47.

These life events and Stewart's mental capacity to dissociate from such tragedy strongly support his claim that he suffered from dissociative amnesia at the time of C.A.'s

26

death and at his trial. These painful experiences plausibly trigger Stewart's mental state into a "fight or flight" response, forcing his brain to retreat into somewhat of a coping mechanism to shield his mind from these traumatic incidents. He has therefore made a prima facie case that his newly recovered memories of C.A.'s death "could not have been discovered previously through the exercise of due diligence." § 2244(b)(2)(B)(i).

It is important not to assume that every habeas petitioner claiming such incapacity is doing so in a bad faith attempt to relitigate his case. Such an assumption would ignore the nuances of human experience and mental health—and would do a great disservice to all criminal defendants suffering from mental incapacities, which can directly impact their competency to stand trial and ability to assist in their defense. Humans are not carbon copies; the way we manage stress, grief, and trauma is as different and unique as our fingerprints.

## B.

Second, a petitioner's dissociative amnesia diagnosis could demonstrate that it was constitutional error to subject that person to trial, whether or not the diagnosis was known at the time. Stewart argues that when he was tried, he was suffering from the effects of dissociative amnesia, which caused him to repress his memories of C.A.'s death. Trying a criminal defendant who is plagued by such a condition is commensurate to trying an incompetent defendant and is untenable under the Sixth and Fourteenth Amendments.

The promises of the Sixth Amendment—to receive a fair trial, to confront state witnesses, to aid in one's own defense, and to be represented by effective counsel—depend on a criminal defendant's competency to stand trial. U.S. Const. amend. VI; *see Indiana v. Edwards*, 554 U.S. 164, 169–70 (2008). The competency requirement is "a by-product

27

of the ban against trials in absentia," as "the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." *Drope v. Missouri*, 420 U.S. 162, 171 (1975) (citation omitted). Thus, only a defendant with the "present ability to consult with his lawyer with a reasonable degree of rational understanding [and] . . . a rational as well as factual understanding of the proceedings against him" may be tried. *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). In other words, "[t]he accused must be able to perform the functions which are essential to the fairness and accuracy of a criminal proceeding." *Wilson v. United States*, 391 F.2d 460, 463 (D.C. Cir. 1968) (internal quotation marks omitted).

Nationwide, courts have been skeptical when faced with amnesia-based claims. Some fear that if such arguments were widely accepted, bad faith claims of false memory could function as an automatic and unlimited "do-over" card for convicted defendants. *See United States v. Stevens*, 461 F.2d 317, 320–21 (7th Cir. 1972); *United States v. Knohl*, 379 F.2d 427, 436 (2d Cir. 1967). Categorically excluding amnesia as a basis for incompetency, however, produces its own problems. For one, it could lead to "anomalous results." *Wilson*, 391 F.2d at 463. An amnesic defendant who cannot recollect the alleged crime is unable to effectively confront witnesses, aid in his own defense, or consult with his attorneys. He is just as prejudiced as a defendant who lacks the mental faculties to do the same yet is provided none of the same protections.

To avoid that unfairness, I would adopt the D.C. Circuit's functional approach it adopted in *Wilson*. That is, I would hold that a defendant's amnesia may amount to

28

incompetence when it renders the trial unfair. In considering a trial's fairness, the *Wilson* court suggests the following factors:

(1) The extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer. (2) The extent to which the amnesia affected the defendant's ability to testify in his own behalf. (3) The extent to which the evidence in suit could be extrinsically reconstructed in view of the defendant's amnesia. . . . (4) The extent to which the Government assisted the defendant and his counsel in that reconstruction. (5) The strength of the prosecution's case. Most important here will be whether the Government's case is such as to negate all reasonable hypotheses of innocence. If there is any substantial possibility that the accused could, but for his amnesia, establish an alibi or other defense, it should be presumed that he would have been able to do so. (6) Any other facts and circumstances which would indicate whether or not the defendant had a fair trial.

*Id.* (citation omitted); *see also Youtsey v. United States*, 97 F. 937, 941 (6th Cir. 1899) (remanding for further proceedings to determine if defendant's impaired memory affected his ability to make "a rational defense" and the "fundamental right of the court to try the main issue," guilty or not guilty).

Applying the *Wilson* factors here, Stewart's allegations amount to the kind of amnesia which would render a trial unfair, and as a result, unconstitutional. First, Stewart's amnesia suppressed his memory of the only facts in contention at trial: the manner and circumstances of C.A.'s death. Therefore, Stewart's ability to effectively consult with counsel or offer testimony on the most relevant facts in his case was entirely foreclosed. Second, the prosecution's evidence was scarce. In fact, it rested almost solely on statements and writings made by Stewart during the time frame he would have been deluded by his amnesia. Third, because Stewart was the sole eyewitness to C.A.'s death, the case turned on his credibility. There was no extrinsic evidence on which Stewart could

29

build his case. And we must recognize that because Stewart was allowed to proceed pro se he was additionally foreclosed from a skillful defense, which may have overcome the hurdles his amnesia presented.

To perform the § 2244 box-checking inquiry, we may presume the petitioner's allegations are true absent reason to think otherwise.[*] Here, we have no reason to disbelieve Stewart. In support of his application, Stewart provided this Court with a psychologist's opinion. While the psychologist explained that she could not definitively diagnose Stewart without being present for a dissociative episode, she did find that Stewart has a recorded, corroborated history of amnesic episodes, making subsequent episodes highly likely, and that Stewart's reported behavior following C.A.'s death was consistent with symptoms of dissociative amnesia. Pet. Br. App. A at 46–47. She concludes "it is highly probable that [Stewart] was suffering from traumatic shock following the death of C.A.," *id.* at 43, and it is "very possible" he repressed his memory of the event, *id.* at 49. Admittedly, a finding of "very possible" does not instill the utmost confidence; however, a more definite finding is neither necessary to show a prima facie case, *see St. Hubert*, 918 F.3d at 1204 (Martin, J., dissenting from denial of rehearing en banc), nor is it reachable without further factual proceedings.

---

[*] This presumption is a result of the prima facie standard we must apply. "A 'prima facie' showing is nothing more than a showing '[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may later be proved to be untrue.'" *United States v. St. Hubert*, 918 F.3d 1174, 1204 (11th Cir. 2019) (Martin, J., dissenting from denial of rehearing en banc) (citing Prima Facie, *Black's Law Dictionary* (10th ed. 2014)).

30

Thus, we are faced with a narrow question:  based on Stewart's allegations of dissociative amnesia, was he competent to stand trial?  I think not.  If a dissociative state as described by Stewart is proven true, it would have tainted his trial in almost every respect. A conviction resulting from such a trial contravenes the most fundamental guarantee of the Sixth Amendment:  a defendant's right to receive a fair trial.  As a result, I find that Stewart has adequately alleged that he was tried while incompetent which resulted in a constitutional violation, satisfying the second element under § 2244(b)(2)(B).

### C.

Stewart's claim stumbles at the final step in the § 2244(b)(2)(B) analysis—whether the allegations adequately show "that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(B)(i).  Here, "a court must make its § 2244(b)(2)(B)(ii) [] determination—unbounded by the rules of admissibility that would govern at trial—based on all the evidence, including that . . . ha[s] become available only after the trial." *United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011) (internal quotations omitted).  This "inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record," given that the "claim involves evidence [that] the trial jury did not have before it." *Id.* at 613 (quoting *House v. Bell*, 547 U.S. 518, 519 (2006)).

As the majority underscores, the government presented "substantial evidence" demonstrating that Stewart killed C.A. before burning her remains. *Ante* at 15.  Specifically, they point to "the pathologist's testimony that [C.A.] died from blunt force trauma before she was burned," "the letter Stewart sent to one of the police officers indicating his anger

31

about her being in a relationship with someone else and reporting violent acts and/or intentions," "Wright's statement to the police that Stewart 'flipped' after learning that she had sex with someone else before their encounter and did not shower afterwards," "Watson's testimony that Stewart threatened to harm him due to his relationship with [C.A.]," and "Stewart admitt[ing] to burning [C.A.'s] remains." *Ante* at 15–16. While I might quibble with just how "substantial" some of this evidence is, I ultimately agree with the majority that Stewart cannot overcome key facts that suggest his guilt—even with his claim of recovered memories. Stewart's recovered memories are just too vague. Thus, I do not believe that Stewart can clear this hurdle to establish a prima facie case.

## III.

At least in the courts, dissociative amnesia is a nuanced and novel mental condition. My purpose in writing separately is solely to comment on the importance of understanding and engaging with the impact of mental health on criminal defendants. In a different case, where the recovered memories were stronger and the evidence at trial weaker, I might reach a different conclusion. And it is my hope that my colleagues in the majority would too. In the end, however, I agree that Stewart has not established a prima facie case for every element of § 2244(b)(2)(B), so his application does not "warrant a fuller exploration by the district court." *Bennett*, 119 F.3d at 469.

For these reasons, I concur in part and concur in the judgment of the majority's opinion.

32